**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

IN RE

LEXINGTON HOSPITALITY GROUP, LLC                                              CASE NO. 17-51568

DEBTOR

**MEMORANDUM OPINION
AND ORDER**

This matter is before the Court on Creditor PCG Credit Partners, LLC's Motion to Dismiss [ECF No. 19] and supplemental briefing [ECF Nos. 47, 64, and 72] and Debtor's Limited Response to PCG Credit Partners, LLC's Motion to Dismiss [ECF No. 45] and supplemental briefing [ECF No. 63]. The issue is whether Janee Hotel Corporation ("Janee"), the Company Manager of Debtor Lexington Hospitality Group, LLC ("LHG"), had authority to authorize LHG to seek chapter 11 relief. The Court held hearings on August 7 and August 17, 2017. Additional briefing was requested after each hearing [ECF Nos. 33 and 52], and the matter was then taken under submission.

For the reasons stated more fully below, Janee, as Company Manager of LHG, had authority to file a chapter 11 petition on behalf of LHG.

I.    **RELEVANT FACTS AND PROCEDURAL HISTORY.**

The relevant documents are discussed below, and the following facts are undisputed.

A.    **The Original Operating Agreement.**

LHG was organized on May 27, 2015, as a limited liability company in the Commonwealth of Kentucky. [*See generally* Articles of Organization available at http://apps.sos.ky.gov/ImageWebViewer/(S(fmplag55mtkmsk453gobzibd))/OBDBDisplayImage

1

.aspx?id=6177113 (last visited Sept. 14, 2017).][1]  The Articles of Organization indicate that LHG is managed by a manager.  [*Id.*]  The Articles of Organization do not include the name of a manager, but the Secretary of State's public records indicate that the manager is Kenneth Moore. [*See* Kentucky Secretary of State Online Business Records available at https://app.sos.ky.gov/ftshow/(S(bce00qpcxyi1avqb32z1wotm))/default.aspx?path=ftsearch&id=0923470&ct=06&cs=99999 (last visited Sept. 14, 2017).]

The Operating Agreement of Lexington Hospitality Group LLC, a Kentucky Limited Liability Company (the "Original Operating Agreement"), indicates that Janee was the sole Initial Member at the time of organization.  [Original Operating Agreement, ECF No. 45-1, at Sec. 1.1(l), 1.9, 2.2 and Exh. A.]  Kenneth Moore is the President of Janee.  [*Id.* at p. 17.]

The Original Operating Agreement vests the authority "to manage the business and affairs" of LHG in the "Company Manager," further defined as Janee.  [*Id.* at Sec. 1.1(i), 3.1(a).] The Original Operating Agreement also provides:

> (b) Subject to the ultimate authority of the Member, the Company Manager shall have the responsibility and authority to conduct and manage the day-to-day operations and affairs of the Company.  The Company Manager's duties shall including the following matters:
>
> (i)  Contracts in the ordinary course of business including the purchase and sale of real property without limitation to price or location;
>
> (ii)  Personnel and employment matters;
>
> (iii)  Reporting on a monthly basis to the Member as to the day-to-day operations of the Company;
>
> (iv)  Borrowing up to $5,000,000.00;

---

[1] The Court takes judicial notice of the Kentucky Secretary of State's website and documents available thereby.  *See Arvest Bank v. Byrd*, 814 F. Supp. 2d 775, 787 n.4 (W.D. Tenn. 2011).

   (v) Purchases or sales of up to $5,000,000.00 of assets outside the ordinary course of business; and

   (vi) Encumbering the Company's assets.

[*Id*. at Sec. 3.1(b).][2]

  The Company Manager is authorized to "manage the business and affairs of LHG" and "conduct and manage the day-to-day operations," but it must have prior approval of the Member to change LHG's business operations, admit a new member, or conduct potential conflict of interest transactions without the prior approval of the members. [*Id*. at Sec. 3.1(c).] The Original Operating Agreement does not contain any provisions that expressly address the Company Manager's and/or Member's authority, or lack thereof, to file bankruptcy on LHG's behalf.

  **B.**  **The Amended Operating Agreement and Addendum No. 1.**

  In late September 2015, LHG acquired the Lexington Clarion Hotel and Conference Center at 5532 Athens Boonesboro Road, Lexington, Kentucky. PCG Credit Partners, LLC ("PCG") provided financing through a Security Promissory Note dated September 28, 2015, in the amount of $6,150,000.00 (the "Note"). [Affidavit of Hal Johnson in Support of Motion for Appointment of Receiver and Related Relief, ECF No. 19-3, at ¶¶ 3-4.] The Note is secured by a Mortgage and Security Agreement and an All-Assets Security Agreement covering the hotel and the related property. [*Id*. at ¶¶ 5-6.] Collectively, the Note, Mortgage and Security Agreement, and All-Assets Security Agreement are hereinafter referred to as the "Loan."

  The Amended and Restated Operating Agreement of Lexington Hospitality Group, LLC, a Kentucky Limited Liability Company (the "Amended Operating Agreement"), dated

---

[2] The "Company" is defined as LHG in the governing documents, and the term is used to reference LHG in this Opinion as well. [Original Operating Agreement at Sec. 1.1(h).]

3

September 29, 2015, was executed contemporaneously with the Loan. The Amended Operating Agreement indicates that it was executed to reflect the admission of 5532 Athens LLC ("5532 Athens") as a member of LHG. [Amended Operating Agreement, ECF No. 45-2, at p. 1.] PCG admits that it owns and/or controls 5532 Athens and the 30% membership interest was given to 5532 Athens "in exchange for, among other things" financing that PCG provided for the acquisition of the hotel. [PCG Credit Partners, LLC's Supplemental Brief in Further Support of Motion to Dismiss, ECF No. 64 ("PCG Supp. Resp."), at pp. 1-2.] The interest of 5532 Athens is referred to as an "Equity Kicker" throughout the relevant documents.

The Amended Operating Agreement provides that 5532 Athens is admitted as a 30% member "until such point that Lexington Hospitality Group, LLC has repaid the Loan Amount, Exit Fee…and Equity for funds." [Amended Operating Agreement at p. 1.] The Amended Operating Agreement also states that the membership interest of 5532 Athens cannot be diluted until the Loan is paid. [*Id.* at Sec. 2.5(c).] Upon payment of the Loan, 5532 Athens shall no longer have an interest in LHG. [*Id.* at Sec. 9.1.]

Two other parties received an ownership interest at the same time as 5532 Athens, resulting in the following ownership interests when the Amended Operating Agreement was signed:

| MEMBER | % INTEREST |
| --- | --- |
| Janee Hotel Corporation | 60% |
| 5532 Athens LLC | 30% |
| Dubrs Investments, LLC | 5% |
| Mitul Patel | 5% |

[*Id.* at Sec. 2.2 and Exh. A.]

4

Janee remains the defined Company Manager under the Amended Operating Agreement, and the general provisions in Section 3.1 governing the management of the Company have not changed. [*Compare* Original Operating Agreement at Sec. 3.1(a)-(c) *with* Amended Operating Agreement at Sec. 3.1(a)-(c).] But the Amended Operating Agreement includes several new provisions that relate to and limit LHG's ability to file bankruptcy.

The Amended Operating Agreement includes a new provision that provides: "The Company may declare Bankruptcy only so long as the Independent Manager authorizes such action." [Amended Operating Agreement at Sec. 3.5.] The Independent Manager is defined as Julia A. McCullough. [*Id*. at Sec. 1.1(l).] Similar restrictions are found in Addendum No. 1 to Operating Agreement (Single Purpose Entity Provisions) for Lexington Hospitality Group LLC, a Kentucky Limited Liability Company ("Addendum No. 1"). Addendum No. 1 is attached to, and adopted and incorporated in, the Amended Operating Agreement. [Amended Operating Agreement at p. 1; Addendum No. 1, ECF No. 45-2.]

"Article Three: Independent Manager" of Addendum No. 1 requires LHG to have at least one Independent Manager and states: "In order for the Company to declare Bankruptcy or dissolve and liquidate its assets, the Independent Manager must provide authorization, and then only upon a 75% vote of the Members." [Addendum No. 1 at p. 5.] Article Three includes a list of nine requirements that attempt to preserve the independence of the Independent Manager. [*Id*. at p. 4.] It then limits the Independent Manager's ability to act, vote, or otherwise participate in Company matters to those specific matters required by the Agreement, which is only the consent to file bankruptcy. [*Id*. at p. 5.] The Independent Manager is also instructed to consider the interests of the Company in acting or otherwise voting, as well as the interests of creditors and the economic interests of 5532 Athens. [*Id*.] Article Three next eliminates any fiduciary duty or

5

liability that the Independent Manager might have to other members or managers. [*Id*.] The Independent Manager's role is terminated upon repayment of the Loan and the Equity Kicker.[3] [*Id*.]

"Article Two: Restrictions/Limitations on Powers and Duties" of Addendum No. 1 contains another condition restricting LHG's right to file any bankruptcy petition. [*Id*. at p. 3.] It provides that LHG shall not file bankruptcy "without the advance, written affirmative vote of the Lender and all members of the Company." [*Id*. (subsection (u)).] The Lender is identified as PCG in the recitals to the Amended Operating Agreement. [Amended Operating Agreement at 1.] This provision directly conflicts with "Article Three: Independent Manager," which only requires a 75% vote of the Members.

The provisions restricting a bankruptcy filing in the Amended Operating Agreement and Addendum No. 1 described in this Section I.B are referred to herein as the "Bankruptcy Restrictions."

        C.        **The Forbearance Agreement and Addendum No. 2.**

On February 9, 2017, LHG, as the "Borrower," entered into a Forbearance Agreement with PCG, defined as the "Lender," after LHG defaulted on the Note. [Forbearance Agreement, ECF No. 45-3.] The Forbearance Agreement obligated LHG (not the Members) to execute the attached Addendum to The Operating Agreement of Lexington Hospitality Group LLC ("Addendum No. 2"). [*See* Forbearance Agreement, ECF No. 45-3, at ¶ III.B.1; Addendum No.

---

[3] The value of the Equity Kicker is $2,700,000.00. [Addendum No. 1 at pp. 7-8.]

2, ECF No. 45-3.] The Forbearance Agreement was executed by PCG, as Lender,[4] Janee, as Manager of LHG, and Moore and Monee Moore Williams, as guarantors.[5] Addendum No. 2 was signed only by PCG, as Lender, and Janee, for itself and not as manager of LHG, despite a requirement in the Amended Operating Agreement that all Members must consent to an amendment thereto. [Amended Operating Agreement at Sec. 9.7.]

This entity confusion exists in other areas, such that PCG and 5532 Athens are essentially treated as one entity. For example, as part of the Forbearance Agreement, LHG agreed to transfer an additional equity interest to PCG as the Lender equaling 20% of the Company. [Forbearance Agreement at ¶ III.B.1.] But Addendum No. 2 requires Janee (not LHG) to transfer 20% of its membership interests to PCG, "or to a subsidiary or Affiliate as Lender may direct." [Addendum No. 2 at p. 2, ¶ 3]. The recitals in Addendum No. 2 indicate that Janee's membership interests will be transferred to 5532 Athens. [*Id*. at p. 1.] Further, LHG's petition and the parties' arguments reflect the following membership interests on the petition date:

| MEMBER | % INTEREST |
|---|---|
| Janee Hotel Corporation | 40% |
| 5532 Athens LLC | 50% |
| Dubrs Investments, LLC | 5% |
| Mitul Patel | 5% |

[*See* Chapter 11 Petition, ECF No. 1, at p. 9.]

Janee also agreed in Addendum No. 2 to transfer units equal to an additional 1% equity interest to PCG (not 5532 Athens) if LHG did not meet certain financial benchmarks by June 30,

---

[4] The Amended Operating Agreement includes a signature line for 5532 Athens, as Member, but there is no signature. Similarly, the Forbearance Agreement includes a signature line for PCG, as Lender, but it is not executed. PCG has not suggested these are not actual copies of the operative documents, so the relevant signatures are assumed for the purpose of this Opinion.

[5] The other members, 5532 Athens, Dubrs Investments, LLC, and Mitul Patel, did not sign.

7

2017. [Addendum No. 2 at p. 3, ¶ 7.] On July 5, 2017, PCG notified LHG of its default and failure to timely cure. [Notice of Default, ECF No. 45-4.] PCG sued LHG in state court and, on July 31, 2017, filed a motion seeking appointment of a receiver. [Motion for Appointment of Receiver and Related Relief, ECF No. 45-5.] Nothing in the record suggests the 1% transfer occurred.

### D.    The Bankruptcy.

On August 3, 2017, LHG filed for chapter 11 relief. The petition was signed by "Kenneth Moore/Janee Hotel Corporation" as Manager. [Chapter 11 Petition at p. 9.] The Corporate Resolution, also dated August 3, 2017, is signed by Janee, as Manager. [Corporate Resolution, ECF No. 3.] The Corporate Resolution directs Moore, as the Authorized Person, to file for chapter 11 relief. [*Id.*] It further disclaims any knowledge as to the contact information or whereabouts of the Independent Manager and does not indicate a member vote was taken. [*Id.*]

On August 6, 2017, PCG filed its motion to dismiss this proceeding, arguing that the Bankruptcy Restrictions were not followed. [PCG Credit Partners, LLC's Motion to Dismiss, ECF No. 19 ("PCG Motion to Dismiss").] PCG also argues that, even if the Bankruptcy Restrictions are excised, the Amended Operating Agreement and the default provisions of Kentucky Limited Liability Company Act, K.R.S. §§ 275.001 *et al*. (the "Kentucky Act") do not allow the Company Manager to authorize a bankruptcy filing. [*See generally* PCG Credit Partners, LLC's Reply in Further Support of Motion to Dismiss, ECF NO. 47 ("PCG Reply"); PCG Supp. Resp.; PCG Credit Partners, LLC's Reply in Further Support of Motion to Dismiss, ECF No. 72 ("PCG Supp. Reply").]

The parties have fully briefed and argued the issues, and the matter is ripe for a decision.

8

II.  DISCUSSION.

A. **The Company's Authority to File Bankruptcy is Controlled by Kentucky Law, but the Validity of the Bankruptcy Restrictions is a Matter of Federal Law.**

State law governs whether a business entity is authorized to file a bankruptcy petition. *In re East End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D. N.Y. 2013); *In re D&W Ltd., LLC*, 467 B.R. 427, 432 (Bankr. E.D. Mich. 2012); *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010). If Janee, as Manager, did not have authority to file the petition acting alone, dismissal is required. 11 U.S.C. § 1112(b); *see also East End Dev.*, 491 B.R. at 639 (lack of consent required by an operating agreement is cause for dismissal). The burden of demonstrating cause for dismissal for lack of authority to file is on the movant. *In re Oregon Homes, LLC*, No. 13-33349, 2014 WL 4794861, at *2 (Bankr. N.D. Ohio Sept. 25, 2014).

LHG is organized as a Kentucky limited liability company pursuant to its Articles of Organization, and the Amended Operating Agreement states that Kentucky law controls. [Amended Operating Agreement at Sec. 9.3.] The Kentucky Act provides that an operating agreement governs the parties' conduct, unless the statutes require otherwise. *See, e.g.*, K.R.S. §§ 275.005, 275.165, and 275.175. The default provisions in the Kentucky Act control if there is no operating agreement or the operating agreement is silent. *Racing Inv. Fund 2000 v. Clay Ward Agency*, 320 S.W.3d 654, 657 (Ky. 2010).

The Amended Operating Agreement exists, and the Bankruptcy Restrictions call into question Janee's ability to act alone, as Company Manager, to authorize the bankruptcy filing. Janee admits it did not obtain the Independent Manager's authority to file, nor did it obtain at least a 75% majority vote in favor of the filing, much less unanimous consent. [*See* Corporate Resolution, ECF No. 3.] It is also undisputed that PCG did not give its authority to file.

9

LHG argues, however, that the Bankruptcy Restrictions are against public policy and unenforceable. Enforceability of the Bankruptcy Restrictions based on public policy is a question of federal law. *In re Bay Club Partners-472, LLC*, No. 14-30394-RLD11, 2014 WL 1796688, at *4 (Bankr. D. Or. May 6, 2014). If the Bankruptcy Restrictions are excised, Janee claims authority to file bankruptcy under the remaining provisions of the Amended Operating Agreement and the Kentucky Act.

### B. The Bankruptcy Restrictions are Unenforceable as Against Federal Public Policy.

#### 1. A Contract Term Imposed by a Creditor that Prohibits a Bankruptcy Filing is Void as Contrary to Federal Public Policy.

Parties to an operating agreement generally have the freedom to contract limited only by the parameters in the relevant articles of organization and statutory law. But, there is a strong federal public policy in favor of allowing individuals and entities their right to a fresh start in bankruptcy. "It has been said many times and many ways. '[P]repetition agreements purporting to interfere with a debtors rights under the Bankruptcy Code are not enforceable.'" *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 263 (Bankr D. Del. 2016) (quoting *MBNA Am. Bank, N.A. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 275 B.R. 712, 723 (Bankr. D. Del. 2002)).

Thus, many courts have held that attempts to contract away the right to file bankruptcy are generally unenforceable. *The Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002); *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 652 (B.A.P. 9th Cir. 1998). "Indeed, since bankruptcy is designed to produce a system of reorganization and distribution different from what [*sic*] would obtain under nonbankruptcy law, it would defeat the purpose of the Code

10

to allow parties to provide by contract that the provisions of the Code should not apply." *In re 203 N. LaSalle St. P'ship*, 246 B.R.325, 331 (Bankr. N.D. Ill. 2000).

Based on this public policy consideration, courts have held that contractual provisions in operating agreements that essentially prohibit a company's ability to file bankruptcy without a creditor's consent are void. *See Intervention Energy Holdings,* 553 B.R. at 263-264; *In re Lake Michigan Beach Pottawattamie Resort, LLC*, 547 B.R. 899, 913 (Bankr. N.D. Ill. 2016); *Bay Club Partners-472, LLC*, 2014 WL 1796688 at *4-5. The bankruptcy court in *Intervention Energy Holdings* explained:

> A provision in a limited liability company governance document obtained by contract, the sole purpose and effect of which is to place into the hands of a single, minority equity holder the ultimate authority to eviscerate the right of that entity to seek federal bankruptcy relief, and the nature and substance of whose primary relationship with the debtor is that of creditor—not equity holder—and which owes no duty to anyone but itself in connection with an LLC's decision to seek federal bankruptcy relief, is tantamount to an absolute waiver of that right, and, even if arguably permitted by state law, is void as contrary to federal public policy.

553 B.R. at 265.

This is not to say that members of a business entity cannot freely agree among themselves not to file bankruptcy. *See, e.g., In re Squire Court Partners LP*, No. 4:16CV00935JLH, 2017 WL 2901334, at *4 (E.D. Ark. July 7, 2017) (holding it was not proper to ignore the corporate governance documents "when the owners retain for themselves the decision whether to file bankruptcy."); *DB Capital Holdings, LLC v. Aspen HH Ventures, LLC (In re DB Capital Holdings, LLC)*, 463 B.R. 142, at *3 (B.A.P. 10th Cir. 2010) (unpublished) (an agreement forced on members by a creditor solely for its own interest is distinguishable from an agreement among members). Thus, the issue is whether the Bankruptcy Restrictions were imposed by PCG, as a creditor, to create an absolute waiver of LHG's right to file bankruptcy.

11

## 2. The Bankruptcy Restrictions are Void as Contrary to Federal Public Policy.

The Bankruptcy Restrictions added to LHG's governing documents, and the dilution of Janee's membership interests to enable an entity controlled by PCG to carry the deciding vote, create an absolute waiver of LHG's right to file bankruptcy. Therefore, the Bankruptcy Restrictions violate federal public policy and are void as discussed below.

First, the record reflects that the Bankruptcy Restrictions were a necessary part of the Loan. The Original Operating Agreement contained none of the Bankruptcy Restrictions and had no provisions that addressed the authority to file bankruptcy. Further, PCG concedes that 5532 Athens, an entity it controlled, received the Equity Kicker as a condition of the financing. [PCG Supp. Resp. at pp. 1-2.]

Second, the purpose of the Bankruptcy Restrictions was to prohibit LHG's ability to file bankruptcy without PCG's consent. A requirement that an independent person consent to bankruptcy relief, properly drafted, is not necessarily a concept that offends federal public policy. The appointment of an independent person to help decide the need for a bankruptcy filing may suggest fairness on all sides. The input of a truly independent decision maker avoids the fear and risk that a member or manager will act in its own self-interest. But, Article Three of Addendum No. 1 shows that the Independent Manager is not a truly independent decision maker.

Article Three sets forth criteria required of the Independent Manager that appear to require true independence. [Addendum No. 1 at p. 4 (subsections (a)-(i)).] The independence and impact of these provisions, however, are limited by the remaining paragraphs in Article Three. The Independent Manager is instructed to consider the interests of creditors and 5532 Athens, such that her duties to the Company and parties are abrogated. [*Id*. at p. 5.] An

12

independent decision maker cannot exist simply to vote "no" to a bankruptcy filing, but should also have normal fiduciary duties. *See Lake Michigan Beach*, 547 B.R. at 911-913. Article Three also limits the existence of the Independent Manager to payment of the Note and Equity Kicker, which links her directly to the Loan. This connection with the financing highlights the concern that the Independent Manager is not actually independent from the creditor who negotiated for her participation in a bankruptcy decision.

Regardless, there is no need to consider the independence of the Independent Manager because the penultimate sentence of Article Three confirms that the Independent Manager is merely a pretense to suggest that the right to file bankruptcy is not unfairly restricted. The sentence provides: "In order for the Company to declare Bankruptcy or dissolve and liquidate its assets, the Independent Manager must provide authorization, **and then only upon a 75% vote of the Members**." [Addendum No. 1 at p. 5 (emphasis supplied).]

A 75% majority vote gives the impression that LHG's Members may decide whether or not to file without outside influence, but the term is just another attempt to disguise the full impact of the restriction. Janee agreed as part of the Loan to dilute its 100% ownership interest to give a 30% membership interest to 5532 Athens and divide another 10% membership interest between two other minority members. Janee also agreed it would not dilute 5532 Athens' 30% membership interest, except upon payment of the Note and Equity Kicker. Janee's initial 100% membership interest was therefore reduced to only a 60% interest, making it impossible for Janee and the other minority members to achieve a 75% majority without an affirmative vote from 5532 Athens.

PCG admits that it owns and controls 5532 Athens. [*See* PCG Motion to Dismiss, at p. 1 n. 1 (PCG admits ownership or control).] Even without this admission, PCG's complete degree

13

of control is underscored in the operating agreements and addendums as previously discussed in Section I.C of this Opinion.[6] Thus, even if the Independent Manager understands her duties and decides bankruptcy is the best option, PCG could always use its control of 5532 Athens to block a bankruptcy filing.[7]

PCG's power to prohibit a bankruptcy filing is even more direct in Article Two of Addendum No. 1. This section gives PCG veto power regardless of the Members' consent to a bankruptcy filing. [Addendum No. 1 at p. 3 (subsection (u)).] So, even if 5532 Athens understands its duties and votes with the other Members to seek bankruptcy relief, and the Independent Manager consents, PCG could still withhold its approval. Unlike a member or manager, PCG has no restrictions and no fiduciary duties to LHG that might limit self-interested decisions that ignore the best interests of the Company. *See Lake Michigan Beach*, 547 B.R. at 913 ("The essential playbook for a successful blocking director structure" requires normal director fiduciary duties.)

Such provisions, alone or working in tandem, serve only one purpose: to frustrate LHG's ability to file bankruptcy. As a result, the Bankruptcy Restrictions are unenforceable.

---

[6] PCG also periodically refers to PCG and 5532 Athens interchangeably in its briefing as "5532 Athens/PCG." [PCG Supp. Resp. at p. 2 ("Subsequent thereto and for good and valuable consideration, on or about February 9, 2017, Janee transferred twenty percent (20%) of its then membership interests in the Debtor to 5532 Athens/PCG thereby making Janee a minority owner of the Debtor and 5532 Athens a fifty (50%) percent owner.")].

[7] The 75% membership vote requirement conflicts with the unanimous consent requirement also found in Addendum No. 1. *Supra* at Section I.B of this Opinion. Because the impact of 5532 Athens ownership interest affects the ability to file bankruptcy when only a 75% vote is required, it does not matter if unanimous consent is also required – the result is the same and 5532 Athens/PCG controls the vote.

> **C.** **The Company Manager has Authority to File Bankruptcy pursuant to the Amended Operating Agreement and the Kentucky Act.**
>
>> **1. The Duties of the Company Manager Do Not Exclude the Ability to File for Bankruptcy Protection.**

The parties have not argued against the validity of the remaining provisions of the Amended Operating Agreement if the Bankruptcy Restrictions are void and unenforceable. This result is required by the Amended Operating Agreement, which contains a clause that provides that the remaining provisions are valid even if some provisions are declared invalid. [Amended Operating Agreement at Sec. 9.6.]; *see also Patton v. 24/7 Cable Co., LLC*, No. N12C-01-177CLS, 2013 WL 1092147, at *3 (Del. Super. Ct. Jan. 30, 2013) (courts uphold remaining terms unless it must rewrite the agreement); *Cox v. Wagner*, 907 S.W.2d 770, 771 (Ky. 1995) (Kentucky courts will not set aside the entire contract unless "good and bad parts cannot be separated without altering [the contract's] purpose."). There is no basis to ignore the remaining terms of the Amended Operating Agreement.

Article III of the Amended Operating Agreement, titled "MANAGEMENT AND CONTROL OF COMPANY," gives the Company Manager broad authority to "manage the business and affairs of the Company." [Amended Operating Agreement at Sec. 3.1(a).] Section 3.1(b) includes a list of the day-to-day operations, and Section 3.1(c) contains a list of actions that require the unanimous consent of the members. Neither provision specifically addresses bankruptcy, nor does any other remaining provision in Article III.

LHG asserts that the omission of any mention of bankruptcy simply means that Janee has the power to file bankruptcy under the Kentucky Act, which grants a manager broad authority and does not restrict a manager's ability to put a company into bankruptcy. In contrast, PCG argues for a more restrictive reading of the Amended Operating Agreement. PCG asserts the

15

authority of the Manager in Section 3.1(b) is limited to "day-to-day operations" and LHG has admitted that filing bankruptcy is not part of a business' day-to-day operations. *See, e.g., In re Loverin Ranch*, 492 B.R. 545, 548 (Bankr. D. Or. 2013) ("Filing a voluntary bankruptcy case is a paradigm action outside the ordinary course of [business].") PCG concludes that the Amended Operating Agreement "is the only document that is relevant for the Court's consideration of the Manager's authority because it shows a clear intent to override the 'default provisions' of the Kentucky Revised Statutes…by expressly limiting the scope of the Manager's authority…" [PCG Supp. Reply at p. 5.]

PCG is reading too much into the Amended Operating Agreement. Section 3.1(a) specifically vests broad authority in the Company Manager "except as expressly provided otherwise in this Agreement." Except for the unenforceable Bankruptcy Restrictions, no other provision in the Amended Operating Agreement "expressly provides" that the Company Manager does, or does not, have authority to file bankruptcy.

Further, courts look to Kentucky law when an operating agreement is silent, and the Kentucky Act supports a manager's authority to file bankruptcy on the Company's behalf. *See Chapman v. Reg'l Radiology Assocs., PLLC*, No. 2010-CA-00131-MR, 2011 WL 1085999, at *6-7 (Ky. Ct. App. Mar. 25, 2011). The broad parameters of a manager's authority in a manager-managed limited liability company are found in § 275.165 and § 275.175 of the Kentucky Act. Section 275.165 outlines the manager's exclusive power to manage the overall business and affairs of the company:

> If the articles of organization vest management of the limited liability company in one (1) or more managers, except to the extent otherwise provided in the articles of organization, the operating agreement, or this chapter, the manager or managers shall have exclusive power to manage the business and affairs of the limited liability company. Unless otherwise provided in the articles of

16

>   organization or the operating agreement, managers:
>
>   (a) Shall be designated, appointed, elected, removed, or replaced by a vote, approval, or consent of the majority-in-interest of the members;
>
>   (b) Shall not be required to be members of the limited liability company or natural persons; and
>
>   (c) Unless they are sooner removed or sooner resign, shall hold office until their successors shall have been elected and qualified.

K.R.S. § 275.165(1).

The voting provisions of the Kentucky Act also show the expansive nature of a manager's ability to operate a company. A simple majority of managers is all that is necessary to decide "any matter connected with the business affairs" of the company, unless the articles of incorporation, written operating agreement, or the Act state otherwise. K.R.S. § 275.175(1). Section 275.175(2) imposes some limitations by requiring unanimous member consent for certain duties, but bankruptcy is not one of them. K.R.S. § 275.175(2). The manager's authority under the Kentucky Act is not limited to day-to-day operations or the ordinary course of business. *See* Thomas E. Rutledge, *The Lost Distinction Between Agency and Decisional Authority: Unfortunate Consequences of the Member-Managed Versus Manager-Managed Distinction in the Limited Liability Company,* 93 KY. L.J. 737, 747 (2005) (citations omitted) (indicating the provisions of K.R.S. § 275.175(1)-(2) give a manager "extraordinary" authority to run the business of the company).

Filing bankruptcy may be outside the ordinary course, but it is a business decision and is connected to the business affairs of the Company. Thus, Janee had authority under the Amended Operating Agreement and the Kentucky Act to file the petition for LHG.

17

### 2. Any Limitation on the Apparent Authority of the Company Manager Does Not Limit Janee's Authority to File Bankruptcy.

PCG also argues that a manager's authority in a manager-managed limited liability company is limited by K.R.S. § 275.135. [PCG Reply at p. 2.] The relevant parts of K.R.S. § 275.135 upon which PCG relies are:

(2)    …

> (b) Every manager shall be an agent of the limited liability company for the purpose of its business or affairs, and the act of any manager, including, but not limited to, the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business or affairs of the limited liability company of which he is the manager shall bind the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter, and the person with whom the manager is dealing has knowledge or has received notification of the fact that the manager has no such authority.

> (3) An act of a manager or a member which is apparently not for the carrying on in the usual way of the business or affairs of the limited liability company shall not bind the limited liability company unless, at the time of the transaction or at any other time, the act is authorized in accordance with the operating agreement.

PCG's argument is unavailing.

Section 275.135 is not applicable to this discussion because it deals with statutory *apparent* agency authority of members or managers of limited liability companies, not the manager's *actual* authority to make decisions in § 275.165 and § 275.175. *See* Thomas E. Rutledge, *The 2007 Amendment to the Kentucky Business Entity Statutes*, 97 KY. L. J. 229, 260 (2009) (citations omitted) (discussing the legislative decision to move a provision addressing delegation of actual authority from § 275.135 to § 275.165(3) because of the differences between actual authority and apparent authority). Section 275.135 has no bearing on whether a manager has actual authority to act on behalf of the limited liability company.

     **D.**     **Janee was the Manager at the Time the Petition was Filed.**

PCG argues Janee was not the manager as of July 19, 2017, pursuant to the Forbearance Agreement and Addendum No. 2. Janee had agreed that it would transfer an additional 1% equity interest in LHG to PCG if it failed to timely cure a default. [Addendum No. 2 at p. 3, ¶ 7.] Janee also agreed to "take any necessary action to transfer to PCG, or its agents, affiliates subsidiaries or assigns, management and control of the Company." [*Id.*] LHG has not contradicted the existence of the defaults described in the July 5, 2017 default letter. [PCG Motion to Dismiss, at p. 4; *see also* Default Letter, ECF No. 19-2.]

The argument Janee was not the Company Manager on the petition date is not persuasive. The Forbearance Agreement and Addendum No. 2 are not self-executing. It is undisputed that Janee did not take any action to transfer management or control.[8] PCG notified Janee of its intent to take steps to remove Janee by the appointment of a receiver and sought appointment of a receiver in state court, but the process was interrupted by LHG's bankruptcy filing. Janee's default and failure to act did not automatically divest Janee of is status at the Company Manager.

**III.**    **CONCLUSION.**

Janee had authority to approve a bankruptcy filing on behalf of LHG as Company Manager. Therefore, based on the foregoing, it is ORDERED that PCG's Motion to Dismiss [ECF No. 19] is DENIED.

---

[8] It is also questionable whether Addendum No. 2 is even effective. Amending the governing documents to name a new Company Manager requires a unanimous written agreement of the members. [Amended Operating Agreement at Sec. 9.7.]

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
Dated: Friday, September 15, 2017
(grs)