**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

IN RE

**LEXINGTON HOSPITALITY GROUP,**                                **CASE NO. 17-51568**
**LLC**

**DEBTOR**

**MEMORANDUM OPINION**
**AND ORDER**

This matter is before the Court on the Debtor's Emergency Motion to Extend Cash

Collateral Use [ECF No. 110].  The Debtor Lexington Hospitality Group, LLC seeks approval to

use cash collateral pursuant to 11 U.S.C. § 363(c)(2)[1] because it is unable to reach an agreement

with the creditor, PCG Credit Partners, LLC ("PCG").  The Court held a preliminary hearing on

October 2, 2017 [ECF No. 120] and set the matter for an evidentiary hearing [ECF No. 122].  An

evidentiary hearing was conducted on October 19, 2017 [ECF No. 143].  The parties were

ordered to further supplement the record [ECF No. 150] and the matter was submitted for a

decision.

For the reasons stated herein, the Hotel Revenue (as defined herein) is not cash collateral

for which the Debtor must seek consent or approval under § 363(c)(2).  Therefore, the Debtor's

Motion is granted.

**I.    FACTS AND PROCEDURAL HISTORY.**

**A.  The Loan Agreement with PCG.**

The Debtor borrowed $6,150,000.00 at 12% interest for a period of 15 months pursuant

to a loan agreement with PCG dated September 28, 2015 [Proof of Claim No. 6] ("Note") to

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

acquire the Lexington Clarion Hotel and Conference Center at 5532 Athens Boonesboro Road, Lexington, Kentucky ("Hotel").  The Note is secured by the Mortgage and Security Agreement dated September 28, 2015, of record in Mortgage Book 8397, Page 41, in the Fayette County, Kentucky, Clerk's Office.  [Proof of Claim No. 6; ECF No. 154-1 ("Mortgage").]  The Mortgage includes a provision that assigns the Debtor's interests in leases and rents.  [Mortgage, ¶¶ 1.01.f and 1.02.]

The Note is also secured by the All-Assets Security Agreement dated September 28, 2015, by and between PCG and the Debtor.  [Proof of Claim No. 6; ECF No. 155-2 ("Security Agreement").]  The Security Agreement recites the Debtor's grant of a security interest to PCG in all its collateral.  [Security Agreement, Art. III.]  Collateral, as defined in the Security Agreement, includes, but is not limited to, "Accounts" and "General Intangibles, including payment intangibles."  [*Id.*, Art. II(d).]

PCG filed Financing Statement No. 2015-2793238-2.01 with the Kentucky Secretary of State on October 13, 2015, to perfect its interest in the Collateral.  [Proof of Claim No. 6; ECF No. 155-3 ("Financing Statement").]  The Financing Statement begins by indicating that PCG has a security interest in:

> All furnishings, equipment, machinery, goods, inventory, accounts, deposits, contracts, furniture, fixtures, leasehold improvements, buildings, tangible personal property, and all other property (excluding removable personal property owned by tenants) now owned or hereafter acquired by Debtor for use in Debtor's business on the property located at 5532 Athens-Boonesboro Rd. Lexington, KY 40509 (the "Real Property"), and all improvements thereon, . . .

The Financing Statement thereafter becomes more specific.  It provides a general list of "chattels or goods" covered, including the proceeds thereof, a reference to the Mortgage and Security Agreement and a specific list of tangible personal property used at the Hotel.  The

2

Financing Statement does not identify "general intangibles" or "payment intangibles" in its description of the Collateral.

The Debtor defaulted on the Note and entered into the Forbearance Agreement with PCG dated February 9, 2017.  [Proof of Claim No. 6.]  On July 5, 2017, PCG notified the Debtor of its default under the Forbearance Agreement.  [July 5, 2017 Letter, ECF No. 19-2.]  PCG subsequently sought the appointment of a receiver in state court, but the Debtor filed bankruptcy before the request was addressed.

### B.  The Bankruptcy and Cash Collateral Dispute.

The Debtor filed a chapter 11 petition on August 3, 2017.  PCG filed Proof of Claim No. 6 on September 15, 2017, in the amount of $8,633,153.10, with a default interest rate of 36%.  PCG indicates the claim is secured by all of the Debtor's assets based on a "Mortgage/UCC Financing Statement."  The Loan Agreement, Note, Mortgage, Security Agreement, Financing Statement, and Forbearance Agreement are attached to the Proof of Claim.

The Debtor sought permission to use cash collateral according to a proposed budget for August 2017 immediately upon filing its chapter 11 petition.  [ECF No. 8 ("First Cash Collateral Motion").]  The First Cash Collateral Motion indicates PCG may claim an interest in cash collateral.  [*Id.*]  The Debtor also filed the Notice of Filing Preliminary Evidence of Liens in Cash Collateral that attached the Financing Statement.  [ECF No. 17.]  An amended budget was filed on August 4, 2017, prior to the hearing on the First Cash Collateral Motion.  [ECF No. 16.]

The Debtor and PCG entered into the Agreed Order for Interim Use of Cash Collateral [ECF No. 54] ("First Cash Collateral Order") based on another amended budget [First Cash Collateral Order, Exhibit A] that provided for a $5,000.00 adequate protection payment to PCG.

3

The parties then shifted their focus to PCG Credit Partners, LLC's Motion to Dismiss [ECF No. 19], which was denied by the Memorandum Opinion and Order entered on September 15, 2017. [ECF No. 85.]

On August 23, 2017, the Debtor filed the Emergency Motion to Modify Cash Collateral Budget and Extend Cash Collateral Use.  [ECF No. 56 ("Second Cash Collateral Motion").]  The Debtor sought permission to continue cash collateral use into September 2017 based on an amended budget for August and September 2017 attached as Exhibit A to the Second Cash Collateral Motion.  The Debtor amended the budget on August 24, 2017.  [ECF No. 62.][2]

PCG did not file an objection to the budget attached to the Second Cash Collateral Motion or its August 24 amendment.  PCG did raise concerns about the Debtor's failure to share financial information at the hearing on August 29, 2017.  PCG also suggested the numerous amendments raised doubts about the accuracy of the Debtor's budget.  The Debtor attributed the problems to the absence of the person responsible for its account at the Debtor's bookkeeping company.

The Second Cash Collateral Motion was granted on an interim basis at the August 29 hearing.  [ECF No. 69.]  An order approving the Second Cash Collateral Motion was tendered on September 26, 2017, and entered the next day.  [ECF No. 111 ("Second Cash Collateral Order").]  The Second Cash Collateral Order indicates PCG had seen the order before it was tendered.[3]

---

[2] Neither the budget attached to the Second Cash Collateral Motion nor the August 24 amended budget provides for adequate protection payments to PCG.

[3] This is a common practice in this District.  A party that does not have authority, or refuses, to sign an order is given the opportunity to raise issues if the tendered order is not consistent with the relief granted at a hearing.

On September 8, 2017, PCG filed the Emergency Motion to Prohibit Use of Cash

Collateral and/or for Related Relief.  [ECF No. 79.]  PCG complained that the Debtors had

submitted multiple budgets to PCG, again calling into question the accuracy of the information

provided.  Among other reasons, PCG argued that the budgets were not accurate because they

failed to include income and expenses from the operation of a Bennigan's restaurant on site.

[*Id.*]

A hearing on PCG's Motion to Prohibit Use of Cash Collateral was held on September

11, 2017.  The Debtor's counsel conceded some inaccuracies, but argued the Debtor's revised

budget, filed the same day, addressed the problems.  [ECF No. 81.]  The Debtor orally moved to

extend cash collateral use and a tendered order based on the September 11 modified budget was

entered on September 20, 2017.  [ECF No. 90 ("Third Cash Collateral Order").]  The Third Cash

Collateral Order indicates that PCG had seen the order before it was tendered.  A separate Order

was entered granting in part and denying in part PCG's request to prohibit cash collateral use.

[ECF No. 106.]   The Debtor was also ordered to provide a full and complete accounting of all

cash and cash collateral received and used by the Debtor from May 1, 2017, through September

13, 2017.  [*Id.*]

The accuracy of the Debtor's budgets is not the only issue driving the dispute over cash

collateral.  PCG also objects to the Debtor's use of cash collateral to pay professional fees.   On

September 18, 2017, PCG filed a Limited Objection [ECF No. 88] to Debtor's Emergency

Motion for Interim and Final Approval of Debtor's Application to Employ DelCotto Law Group

PLLC as Its General Counsel Effective as of the Petition Date.  [ECF No. 13.]  PCG's objection

was denied because the Debtor's counsel was not seeking immediate approval of a carve-out or

escrow; counsel was only disclosing the likelihood of a future request.  [ECF No. 135.]

The Debtor did, in fact, propose an escrow for legal fees in the Emergency Motion to
Extend Cash Collateral Use filed on September 26, 2017.  [ECF No. 110 ("Fourth Cash
Collateral Motion").]  The Debtor sought cash collateral use through October 31, 2017,
according to a budget attached as Exhibit A, and later amended on September 29, 2017.  [ECF
No. 117.]  The proposed budget included a $5,000.00 adequate protection payment to PCG and
$25,000.00 for "Legal Fees – escrow/subject to court approval."  The Debtor represented in the
Fourth Cash Collateral Motion that it was unable to reach an acceptable carve-out arrangement
for professional fees and expenditures necessary to avoid immediate and irreparable harm to the
Debtor's estate.

A hearing on the Fourth Cash Collateral Motion was held on October 2, 2017.  PCG
continued to raise concerns regarding the accuracy of the financial information provided.  PCG
also continued to argue that the Debtor cannot use its cash collateral to pay the Debtor's post-
petition legal fees without PCG's consent.   The matter was set for an evidentiary hearing on
October 19, 2017.  [ECF No. 122.]

The Court held an evidentiary hearing on the Debtor's request to extend use of cash
collateral on October 19, 2017.  [ECF No. 143.]  The Debtor's representative, Kenneth Moore,
testified regarding the Debtor's finances.  Also, the Debtor reiterated its claim that PCG does not
have a perfected security interest in the cash collateral.  [*See* ECF No. 127.]  The Debtor believes
that PCG's failure to properly perfect its interest in the cash collateral leaves the Debtor with
sufficient unencumbered cash to fund necessary expenses, including legal fees.

On October 20, 2017, an Order was entered that granted the Debtor authority to use cash
collateral on an interim basis until November 3, 2017, and instructed the Debtor to provide new
or revised financial information that was not available at the time of the October 19 hearing.

[ECF No. 150 ("Fifth Cash Collateral Order").]  Also, the parties were allowed to submit

additional briefing on the legal issues affecting cash collateral.  The supplemental briefing is

complete [ECF Nos. 155 and 156] and the matter is now ripe for decision.

## II.    DISCUSSION.

### A.  Standard of Review for Cash Collateral Use Under §§ 363 and 552.

The Debtor seeks authority to use cash collateral pursuant to § 363(c)(2)(B) and FED. R.

BANKR. P. 4001(b).  According to § 363(c)(2), the Debtor "may not use, sell, or lease, cash

collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B)

the court . . . authorizes such use, sale or lease . . . "  11 U.S.C. § 363(c)(2).

"[T]he concept of cash collateral is a feature of and defined in, the Bankruptcy Code and

is operative only after the commencement of a bankruptcy case under title 11 U.S.C." *Hartigan*

*v. Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co*.), 16 B.R. 750, 756 (Bankr.

S.D. N.Y. 1982).  "Cash collateral" is defined under the Code as:

> cash, negotiable instruments, documents of title, securities, deposit
> accounts, or other cash equivalents whenever acquired in which the estate
> and an entity other than the estate have an interest and includes the
> proceeds, products, offspring, rents, or profits of property and the fees,
> charges, accounts or other payments for the use or occupancy of rooms and
> other public facilities in hotels, motels, or other lodging properties subject
> to a security interest as provided in section 552(b) of this title, whether
> existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a); *see also* 3 COLLIER ON BANKRUPTCY ¶ 363.01 (Alan N. Resnick & Henry J.

Sommer eds., 16th ed.) (cash collateral includes assets in which both the estate and another entity

have an interest).  The definition of cash collateral under § 363(a) also specifically includes the

proceeds from cash and cash equivalents and "fees, charges, accounts, or other payments for the

use or occupancy of rooms and other public facilities in hotels . . . subject to a security interest as provided in § 552(b) . . . " *Id.*

Section 552 addresses the post-petition effect of a security interest. Section 552(a) sets forth the general rule that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). There are two exceptions to the general rule under subsection (a): (1) proceeds; and (2) rents and hotel revenue.

Section 552(b)(1) addresses proceeds of cash and cash equivalents and provides:

> . . . if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1). Proceeds are excluded from the general rule in § 552(a) because a security interest in proceeds is automatic under §§ 9-203(f) and 9-315(a) of the Uniform Commercial Code. 5 COLLIER ON BANKRUPTCY ¶ 552.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Section 552(b)(2) makes it clear that a properly perfected security interest in rents and hotel room revenues continues post-petition:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends

8

> to property of the debtor acquired before the commencement of the case and
> to amounts paid as rents of such property or the fees, charges, accounts, or
> other payments for the use or occupancy of rooms and other public facilities
> in hotels, motels, or other lodging properties, then such security interest
> extends to such rents and such fees, charges, accounts, or other payments
> acquired by the estate after the commencement of the case to the extent
> provided in such security agreement, except to any extent that the court,
> after notice and a hearing and based on the equities of the case, orders
> otherwise.

11 U.S.C. § 552(b)(2).

PCG has the burden of proof on the issue of validity, priority and/or extent of its lien on the property at issue. 11 U.S.C. § 363(p)(2). Whether a party has a security interest within the meaning of § 552 is a question of state law.[4] *Fin. Sec. Assurance, Inc. v. Tollman-Hundley Dalton, L.P.*, 74 F.3d 1120, 1123-24 (11th Cir. 1996). Thus, one must look to Kentucky law to determine if PCG has a properly perfected interest in the collateral at issue. *See* K.R.S. § 355.9-301. Whether the collateral at issue falls within the exceptions of § 552 is a matter of statutory interpretation and federal law. *Fin. Sec. Assurance, Inc.*, 74 F.3d at 1123-24.

Therefore, PCG must first prove that: (i) it has a perfected security interest in the after-acquired property but for § 552(a); and (ii) the after-acquired property falls within one of the two exceptions under § 552(b). If PCG succeeds, it has a lien against cash collateral and is entitled to adequate protection for any use by the Debtor. 11 U.S.C. § 363(a) and (c). The Debtor has the burden of proof on the issue of adequate protection. 11 U.S.C. § 363(p)(1).

---

[4] PCG argues that § 552(b) provides automatic perfection of its interest. This is not correct. PCG's right to the Hotel Revenues is still subject to the trustee's avoiding powers, so PCG must have a perfected security interest. *See, e.g., In re HT Pueblo Properties, LLC*, 462 B.R. 812, 817 (Bankr. D. Colo. 2011) (an enforceable security interest must exist, otherwise the interest is avoidable under § 544 and excepted from § 552(b)).

**B. PCG Has a Security Interest in All Assets, But Perfection is Disputed.**

The Mortgage creates a lien on the Hotel and includes a provision that assigns the Debtor's interests in leases and rents.  [Mortgage, ¶¶ 1.01.f and 1.02.]  The Debtor does not raise any issues regarding the contents or perfection of the Mortgage and none are noted.  [*See* ECF No. 154.]  Therefore, it is assumed for purposes of this Opinion that PCG's mortgage lien against the Hotel is valid and perfected.

The Security Agreement grants a lien on "all right, title and interest" of the Debtor in the "Collateral."  [Security Agreement, Art. III.]  "Collateral" in the Security Agreement is broadly defined to include all assets of the Debtor, including accounts, general intangibles and payment intangibles.  [*Id.*, Art. II.] The Debtor concedes that PCG has a lien on all its personal property and the description in the Security Agreement appears sufficient to cover all assets.  *See* K.R.S. § 355.9-108 (the collateral covered is objectively determinable).

The Debtor disputes, however, that PCG's lien is properly perfected as to all personal property.  PCG filed a Financing Statement with the Kentucky Secretary of State, which is generally sufficient to perfect its interest in personal property under the Uniform Commercial Code.  K.R.S. § 355.9-310.  The Debtor asserts the revenue earned by the Hotel is a payment intangible,[5] a subset of general intangibles,[6] which was omitted from the Financing Statement.[7] Therefore, as debtor-in-possession, the Debtor may avoid the lien pursuant to § 544 and take a

---

[5] "Payment intangible" means a general intangible under which the account debtor's principal obligation is a monetary obligation.  K.R.S. § 355.9-102(bi).

[6] "General intangible" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.  K.R.S. § 355.9-102(ap).

[7] This case does not involve sales, or a transfer of less than a significant part, of payment intangibles.  Therefore, perfection on attachment is not an issue.  K.R.S. § 355.9-309(2), (3).

superior position under Kentucky law.  *See Kendrick v. Deutsche Bank Nat'l Trust Co., et al. (In re St. Clair)*, 380 B.R. 478, 482 (B.A.P. 6th Cir. 2008) (Kentucky law will govern the priority determination).  [*See also generally* ECF Nos. 127, 156.]

PCG counters that the revenue from the operation of the Hotel is rent, not personal property.  As rent, PCG's security interest in the revenue was perfected when it recorded the Mortgage.  Further, even if the revenue is deemed personal property, its security interest is properly perfected by the Financing Statement.  [*See generally* ECF Nos. 128, 155.]

The dispute over the scope of the Debtor's alleged security interest in cash collateral requires a staged review.  The first question is whether the Debtor's revenue is a real property interest or personal property.  If the room revenue is real property, then the Mortgage perfects PCG's interest.  If the revenue is personal property, then it is necessary to identify the type of collateral under the Uniform Commercial Code and the sufficiency of the description of the collateral in the Financing Statement.  If the lien is properly perfected in this manner, PCG has a perfected security interest in the revenue that extends post-petition.  If not, then the Debtor does not need to provide adequate protection to PCG for use of revenue post-petition.

### C.  PCG's Security Interest in Hotel Revenue Does Not Extend Post-petition.

The Debtor operates both the Hotel and a Bennigan's restaurant on the Hotel site. Therefore, the property at issue is both revenue generated from the guests of the Hotel ("Room Revenue") and revenue generated from patrons of the Bennigan's restaurant ("Restaurant Revenue") (collectively referred to hereafter as "Hotel Revenue").  A hotel guest pays for the room using cash or a credit card.  A hotel guest, or other patron, might also eat at the Bennigan's restaurant.  Thus, there are three types of transactions addressed below: (1) room charges paid with cash; (2) room charges paid with a credit card; and (3) restaurants receipts.

11

1.    **PCG's Lien on Room Revenue Does Not Extend Beyond the Petition Date**.

    a. **Room Revenue is Personal Property that Is Note Subject to the Mortgage**.

If the Room Revenue is considered rents derived from the Hotel, the Mortgage will control.  K.R.S. § 355.9-109(4)(k) (the Uniform Commercial Code does not cover a lien on "real property, including a lease or rents thereunder").  But the long-standing majority of cases addressing this issue treat such revenues as personal property.  *See, e.g., Greyhound Real Estate Fin. Co. v. Official Unsecured Creditors' Comm. (In re Northview Corp.),* 130 B.R. 543, 546 n. 4 (B.A.P. 9th Cir. 1991) (California/accounts)*; In re Thunderbird Inn, Inc.*, 151 B.R. 224, 226 (Bankr. D. Ariz. 1993) (Arizona/accounts); *In re Gen. Associated Investors Ltd. P'ship*, 150 B.R. 756, 759 (Bankr. D. Ariz. 1993) (Arizona/account); *In re Punta Gorda Assoc.*, 137 B.R. 535, 537 (Bankr. M.D. Fla. 1992) (Florida/accounts); *In re Nendels-Medford Joint Venture*, 127 B.R. 658, 668 (Bankr. D. Or. 1991) (Oregon/accounts); *Sacramento Mansion, Ltd. V. Sacramento Sav. and Loan Assoc. (In re Sacramento Mansion Ltd*.), 117 B.R. 592, 603 (Bankr. D. Colo. 1990) (California/accounts); *Super 8 Motels, Inc. v. M. Vickers, Ltd. (In re M. Vickers, Ltd*.), 111 B.R. 332, 333-34 (D. Colo. 1990) (Colorado/accounts); *Inv. Hotel Props. Ltd. V. New W. Fed. Sav. and Loan Assoc.,* (*In re Inv. Hotel Props., Ltd*., 109 B.R. 990, 994 (Bankr. D. Colo. 1990) (Missouri/accounts); *Kearney Hotel Partners v. Richardson (In re Kearney Hotel Partners)*, 92 B.R. 95, 98 (Bankr. S.D.N.Y. 1988) (Nebraska/accounts).  More recent decisions are consistent. *See, e.g., Hari Ram, Inc. v. Magnolia Portfolio, LLC (In re Hari Ram, Inc.)*, 507 B.R. 114, 124 (Bankr. M.D. Pa. 2014) (Pennsylvania would likely treat hotel revenues as personal property, but a decision was not required); *In re HT Pueblo Props., LLC*, 462 B.R. 817, 819-20 (Bankr. D. Colo. 2011) (Colorado/personal property); *In re Ocean Place Dev., LLC*, 447 B.R. 726, 732-33

12

(Bankr. D. N.J. 2011) (New Jersey/accounts or payment intangibles); *see also In re Old Colony, LLC*, 476 B.R. 1, 20 (Bankr. D. Mass. 2012) (disagreeing, but conceding the majority position that hotel room revenues are personal property).

All of the aforementioned cases follow the same logic.  The general rule is that "guests in a hotel . . . are mere licensees and not tenants, and . . . they have only a personal contract and acquire no interest in the realty . . . "  *Kearney Hotel*, 92 B.R. at 99 (citations omitted); *see also In re Hari Ram, Inc*., 507 B.R. at 122 (the hotel guest is a licensee whose rights are limited compared to a tenant).  As the *Kearney Hotel* court recognized, if payment for a hotel room created a real property interest, then so would "green fees paid for use of golf courses, roller and ice skating fees, and theatre and stadium reserved seat tickets."  92 B.R. at 99.  This would "distort" the scope of Article 9 of the Uniform Commercial Code.  *Id.; see also Far E. Nat'l Bank. v. U.S. Trustee (In re Premier Golf Props., L.P.)*, 477 B.R. 767, 773 (B.A.P. 9th Cir. 2012) (section 552(b)(2) was added to treat hotel revenues the same as rent receipts).

Courts in Kentucky have not specifically addressed the issue, but existing law confirms Kentucky would follow the majority rule.  A property owner may give a license to use all types of property for varying durations of time in Kentucky.  A license grants authority to enter and use real property, but it does not confer an interest in that property.  *Louisville Chair & Furniture Co. v. Otter*, 294 S.W. 483, 485 (Ky. 1927) (citing *Rittenhouse v. Swango*, 97 S.W. 743, 744 (Ky. 1906)); *Asher v. Johnson*, 82 S.W. 300, 301 (Ky. 1904) (citation omitted).  Further, a license is generally an oral grant that is "a personal privilege and non-assignable."  *Rittenhouse*, 97 S.W. at 744.  In contrast, a lease divests the owner of the right to use or possess the property for the term of the parties' agreement and is usually in writing.  *Mullins v. Nordlow*, 185 S.W.

825, 830 (Ky. 1916) (citing *Mattingly's Ex'r v. Brents*, 159 S.W. 1157, 1160 (Ky. 1913)); *see also* K.R.S. § 382.010 (a deed is required for a conveyance of an interest in property).

In Kentucky, the hotel and guest relationship is significantly different than that of a landlord and tenant.  Hotels in Kentucky are quasi-public institutions "established and maintained for the purpose of serving the public." *Clemons v. Meadows*, 94 S.W. 13, 14 (Ky. 1906); *see also Rowan v. Weaver*, 87 F.2d 592, *1 (6th Cir. 1986) (table) (a Kentucky landlord is not usually liable for a tenant's (or its guest's) injuries, but an innkeeper has more exposure). Generally, a lodger at a hotel is a guest under Kentucky common law, unless the person is a boarder under a contract for a longer term.  *Reed v. Teneyck*, 44 S.W. 356, 356-57 (Ky. 1898). This significantly different relationship is also evidenced by the exclusion of hotels from the Kentucky Uniform Residential Landlord and Tenant Act, which sets out the rights and responsibilities of residential landlords and tenants.  *See* K.R.S. § 383.535(4) (excluding "[t]ransient occupancy in a hotel"); *see also Ocean Place*, 447 B.R. at 734 (finding that the omission from New Jersey's tenant protection act supported the conclusion that hotel revenues are not interests in real property); *Kearney Hotel*, 92 B.R. at 100 (same for the Nebraska tenant protection act).

Room Revenues are therefore an interest in personal property in Kentucky covered by Article 9 of the Uniform Commercial Code.

### b.  PCG Does Not Have a Perfected Security Interest in Room Revenues Generated by Cash Receipts.

Guests staying the night at the Hotel may pay for the privilege with cash.  A cash transaction results in collateral that is "money."  Perfection of a lien in money requires possession.  K.R.S. §§ 355.9-312(2)(c) and 355.9-313.  Further, PCG must have control to

14

perfect its interest in any deposit accounts.[8]  K.R.S. §§ 355.9-312(2)(a) and 355.9-314.  There is

no evidence in the record that PCG was in possession of the Debtor's money or deposit accounts

at the time the petition was filed. [*See* Proof of Claim No. 6; ECF No. 17; *see also* KYEB LBR

4001-2.]

Additionally, a cash payment is a simultaneous transaction that does not create a debt

because it is closed as soon as the transaction occurs.  Thus a cash transaction does not create an

account[9] or payment intangible from which proceeds[10] are generated because there is no

monetary obligation.  *In re The Wright Grp., Inc.*, 443 B.R. 795, 801 (Bankr. N.D. Ind. 2011)

---

[8] "Deposit account" means a demand, time, savings, passbook, or similar account maintained with a bank. The term
does not include investment property or accounts evidenced by an instrument.  K.R.S. § 355.9-102(ac).

[9] 1.  "Account," except as used in "account for," means a right to payment of a monetary obligation, whether or not
earned by performance:
    a.  For property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of;
    b.  For services rendered or to be rendered;
    c.  For a policy of insurance issued or to be issued;
    d.  For a secondary obligation incurred or to be incurred;
    e.  For energy provided or to be provided;
    f.  For the use or hire of a vessel under a charter or other contract;
    g.  Arising out of the use of a credit or charge card or information contained on or for use with the card; or
    h.  As winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of
    a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.
2.  The term includes health-care-insurance receivables.
3.  The term does not include:
    a.  Rights to payment evidenced by chattel paper or an instrument;
    b.  Commercial tort claims;
    c.  Deposit accounts;
    d.  Investment property;
    e.  Letter-of-credit rights or letters of credit; or
    f.  Rights to payment for money or funds advanced or sold, other than rights arising out of the use of a
    credit or charge card or information contained on or for use with the card.  K.R.S. § 355.9-102(b).

[10] "Proceeds," except as used in KRS 355.9-609(2), means the following property:
    1.  Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
    2.  Whatever is collected on, or distributed on account of, collateral;
    3.  Rights arising out of collateral;
    4.  To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference
    with the use of, defects or infringement of rights in, or damage to, the collateral; or
    5.  To the extent of the value of collateral and to the extent payable to the debtor or the secured party,
    insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage
    to, the collateral.  K.R.S. § 355.9-102(bl).

(finding the cash receipts derived from operation of a miniature golf course facility is a

simultaneous transaction that results in money and not debt from which proceeds may be

generated).

PCG did not have a perfected security interest in the cash receipts or deposit accounts on

the petition date.  Thus, Room Revenue generated by a cash payment is not cash collateral

pursuant to § 363(a) that requires adequate protection for, or approval of, PCG under § 363(c)(2).

### c.  PCG Does Not Have a Perfected Interest in Room Revenue Generated by Credit Card Receipts.

#### i.  The Obligation Created from a Credit Card Transaction Is a Payment Intangible.

The bankruptcy court in *Ocean Place* determined that hotel revenues were either

accounts or payment intangibles under the Uniform Commercial Code.  *Ocean Place*, 447 B.R.

at 732 and n. 4.   The actual characterization is not usually relevant because a decision that credit

card receipts are personal property normally ends the analysis.  *See, e.g., id.*; *HT Pueblo*, 462

B.R. at 819-20 (the lender only had a lien on real property).  Here, the type of personal property

as defined by the Uniform Commercial Code and covered by the Financing Statement matters

because the Financing Statement covers accounts but omits payment intangibles.

Older case law generally concludes that Room Revenues are "accounts" without much

analysis.  This is not surprising because the cases predate significant amendments to the Uniform

Commercial Code, which were effective in 1999 and adopted by Kentucky in 2001.  Among

other things, the changes were intended to bring sales of securitized assets under the coverage of

Article 9.  *See, generally,* JAMES J. WHITE, ROBERT S. SUMMERS & ROBERT A. HILLMAN,

UNIFORM COMMERCIAL CODE § 30.20 (6th ed. 2016); KENNETH C. KETTERING, *A True Sale of

Receivables: A Purposive Analysis*, 16 AM. BANKR. INST. L. REV. 511, 538 (Winter 2008).  A

16

new category of obligations was added to the coverage of Article 9 – payment intangibles.  The

term "accounts" covers most monetary obligations, with chattels and payment intangibles

representing the remaining obligations. LAWRENCE R. AHERN, III, *"Workouts" Under Revised*

*Article 9: A Review of Changes and Proposal for Study,* 9 AM. BANKR. INST. L. REV. 115, 133

(Spring 2001).

This Opinion does not need to consider the many issues affecting a securitization

transaction, but the categories of monetary obligations are relevant.  The definitions of accounts

and payment intangibles are found in U.C.C. § 9-102.  The Official Comments to the definitions

provide guidance for classification of payment intangibles.  *See* K.R.S. § 355.1-103(3) (the

Official Comments represent legislative intent to guide interpretation, unless there is conflict).

Comment 5.d to § 9-102 provides, "In classifying intangible collateral, a court should

begin by identifying the particular rights that have been assigned."  U.C.C. § 9-102.  PCG wants

recognition of a continuing security interest in the Room Revenues.  The way Room Revenues

arise from a credit card transaction is simple:

- Guest checks in and hands over credit card to hotel.
- Credit card is charged for a night's stay.
- Guest has satisfied the obligation to hotel.
- Hotel has a right to payment from the credit card company (or merchant bank) based on its credit card agreement.
- The credit card company has a right to payment from guest on the normal billing cycle.

*See, e.g., First Union Nat'l Bank of North Carolina v. Brendle's Stores, Inc. (In re Brendle's*

*Stores, Inc.)*, 165 B.R. 811, 814 (M.D. N.C. 1993) (explaining the credit card system).

Comment 5.d then identifies the result of this transaction:  the hotel's right to payment

from the credit card company is a payment intangible and the credit card company's right to

payment from a hotel guest is an account.  U.C.C. § 9-102.  The comment states:

17

> A debtor's right to payment from another person of amounts received by the other person on the debtor's behalf, including the right of a merchant in a credit-card, debit-card, prepaid-card, or other payment-card transaction to payment of amounts received by its bank from the card system in settlement of the transaction, is a "payment intangible." (In contrast, the right of a credit-card issuer to payment arising out of the use of a credit card is an "account.")

*Id.*

This comment recognizes that both an account and a payment intangible require a "monetary obligation," which does not exist between the hotel and guest. K.R.S. §§ 355.9-102(1)(b) and 355.9 102(1)(bi); *see also* AHERN, *supra*, at 131 n. 97 (accounts are generally thought of as "receivables"). The monetary obligation that exists is the hotel's right to payment from the credit card company under its credit card merchant agreement (a payment intangible). The transaction also creates an obligation from the guest to the credit card company (an account).

The party that owes the monetary obligation is called an "account debtor" by the Uniform Commercial Code, which is "a person obligated on an account, chattel paper, or general intangible." K.R.S. § 355.9-102(1)(c). Comment 5.d recognizes that a person that is not an "account debtor" will not have the rights and obligations set forth in §§ 9-404, 9-405, and 9-406. U.C.C. § 9-102. One such right is the secured creditor's power to demand payment from the account debtor after notification. *See* K.R.S. § 355.9-406(1). It does not make sense to allow such a demand on the guest because the guest has already paid what it owed for the room. The statute could apply to allow a demand on the credit card company, however, so this analysis fits.

A guest transaction using a credit card is a simultaneous transaction like the cash transaction. A hotel has a right to payment from the credit card company (or merchant bank). A credit card company has a right to payment from the guest card holder. PCG has a security

18

interest in the Debtor's payments from the credit card company (or merchant bank), and this right is a payment intangible.

> ## ii.    PCG Does Not Have a Perfected Prepetition Lien on Payment Intangibles.

A financing statement must include three pieces of information:  (i) the name of the debtor, (ii) the secured party, and (iii) "the collateral covered by the financing statement." K.R.S. § 355.9-502(1).  A financing statement sufficiently describes its collateral if it satisfies one of two safe harbors:

> (1)  A description of the collateral pursuant to K.R.S. § 355.9-108; or
>
> (2)  An indication that the financing statement covers all assets or all personal property.

K.R.S. § 355.9-504; *see also* U.C.C. § 9-504 (Official Comment 2).

Under K.R.S. § 355.9-108, the description is sufficient if it reasonably identifies the collateral.  *See Bishop v. Alliance Banking Co*., 412 S.W.3d 217, 219 (Ky. Ct. App. 2013). Kentucky courts review sufficiency of the collateral description using the "inquiry test."  *Id.* Under the inquiry test, "[A] description of collateral is sufficient for either a security agreement or a financing statement if it puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved."  *Nolin Prod. Credit Ass'n v. Canmer Deposit Bank*, 726 S.W.2d 693, 697 (Ky. Ct. App. 1986).  For example, a financing statement with the wrong serial number might still provide inquiry notice if the description of the serial number is so similar as to require an investigation.  *Bishop*, 412 S.W.3d at 220 (the first three digits of serial number were incorrect, but the remaining digits were the same and a description of the equipment was included); *Laurel Explosives, Inc. v. First Nat'l Bank & Trust Co*., 801 S.W.2d 336, 337-38 (Ky. Ct. App. 1990) (finding a one digit error required inquiry).

19

The Financing Statement begins with a description of categories of collateral covered by the Security Agreement that is satisfactory for each category listed.  But the Financing Statement omits both general intangibles and payment intangibles as categories of assets covered.  A payment intangible is a type of general intangible, so a reference to general intangibles would have included payment intangibles.  K.R.S. § 355.9-102(1)(bi).  This omission means the description of collateral in the Financing Statement fails the inquiry test as to payment intangibles, and thus fails the first safe harbor.  It is unreasonable to expect a searcher to make further inquiry when the collateral is completely omitted from the financing statement.

PCG instead relies on the second safe harbor that allows a statement that the Financing Statement covers "all assets or all personal property."  K.R.S. § 355.9-504(2).  PCG argues that the first paragraph on page 2 of the Financing Statement satisfies the second safe harbor because the title of the Security Agreement includes the phrase "All-Asset."  The sentence PCG relies on provides: "This Financing Statement also relates to an obligation secured by a security interest in collateral and is evidenced by the Mortgage referred to above and the All-Assets Security Agreement executed on September 28, 2015."  This is not a sufficient description to perfect an interest in any of the collateral covered by the Security Agreement.

The reference to a document does not describe what is in the document.  In Kentucky, "the title of a document alone does not dictate the substance of the agreement itself."  *See Bluegrass Equine & Tourism Found., Inc. v. Commonwealth*, No. 2011-CA-000218-MR and No. 2011-CA-000257-MR, 2013 Ky. App. Unpub. LEXIS 380, *73 (Ky. Ct. App. May 10, 2013); *see also W. Reserve Life Assurance Co. v. ADM Assocs., LLC*, 737 F.3d 135, 139 (1st Cir. 2013) ("But labels can be misleading, and the Rhode Island courts have sometimes looked beyond the title of a document to deem its substance to be insurance."); *R&G, Inc. v. Midwest Region*

20

*Found. for Fair Contracting, Inc.*, 812 N.E.2d 1044, 1047 (Ill. App. Ct. 2004) ("Thus, a court should examine the substance of a document to determine how it should treat the document."). Kentucky courts look within the four corners of the document to determine the type of legal relationship the parties intended that document to create. *See Bluegrass Equine*, 2013 Ky. App. Unpub. LEXIS 380, at *73 (citing *White Log Jellico Coal Co., Inc. v. Zipp*, 32 S.W.3d 92, 94 (Ky. Ct. App. 2000)).

Further, the reference to the document does nothing more than suggest the document itself is the collateral.  Collateral is defined as the "property subject to a security interest," not the document that creates the security interest.  K.R.S. § 355.9-102(l); *see also Rameker v. Farmers State Bank (In re Lynch)*, 313 B.R. 798, 800 (Bankr. W.D. Wis. 2004) (The statute requires more than notice of an existing security interest; "[t]he collateral must be described."); *Duesterhaus Fertilizer, Inc. v. Capital Crossing Bank (In re Duesterhaus Fertilizer, Inc.)*, 347 B.R. 646 (Bankr. C.D. Ill. 2006) (rejecting a cross-reference to an unattached prior financing statement as a sufficient description of collateral pursuant to U.C.C. § 9-502).

In *Lynch*, the security agreement referenced most or all categories of personal property, but the financing statement described the collateral only as "general business security agreement now owned or hereafter acquired."  *Lynch*, 313 B.R. at 799-800.  This circular reference made it appear the security agreement was the collateral; it is not.  The security agreement is the contract that identifies the collateral and the collateral is the personal property described in the security agreement.  *Id.* at 800.

Strict, or at least very precise, interpretation is required when there is reliance on a safe harbor.  Safe harbor provisions create objective rules to address foreseeable cases, leaving any behavior that falls outside the safe harbor for judicial analysis.  *See* ANDREW STUMPFF

21

MORRISON, *Case Law, Systematic Law, and a Very Modest Suggestion*, 35 STATUTE L. REV. 159, 174 (2014).  "This allocation saves the legislature from having to think through each possible rare future scenario . . . while nonetheless providing clear guidance and avoiding wasting judicial resources for the most common cases."  *Id.* at 177. Therefore, action that does not fit a safe harbor provision should not qualify for its protection.  *See U.S. ex rel. Armfield v. Gills*, Case No. 8:07-cv-2374-T-27TBM, 2012 U.S. Dist. LEXIS 154749, *15 (M.D. Fla. Oct. 29, 2012) ("The burden is on the party seeking protection under a safe harbor provision to demonstrate strict compliance with each and every element of the safe harbor.") (citing *U.S. ex rel. Westmoreland v. Amgen Inc.*, 812 F. Supp. 2d 39, 47 (D. Mass. 2011)).

This analysis requires a conclusion that reference to the Security Agreement does not satisfy a reasoned application of the second safe harbor on the facts of this case.  PCG did not identify any other part of the description of the collateral for review.  This is sufficient indication that the secured creditor did not rely on any other part of the collateral description for the second safe harbor.  *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (not the court's responsibility to research and construct the parties' arguments); *Cao v. Fed. Election Comm. (In re Cao)*, 619 F.3d 410, 434-35 (5th Cir. 2010) (court's role is not to create arguments for adjudication but to adjudicate arguments presented); *Matthew v. City of West Point, Miss.*, 863 F. Supp. 2d 572, 599 (N.D. Miss. 2012) (declining to make arguments not raised or pressed by defendant); *In re McFadden*, 477 B.R. 686, 689 (Bankr. N.D. Ohio 2012) (it is beyond the court's duties to create claims or make legal arguments).

PCG does not have a perfected lien on the Room Revenues generated by credit card receipts.  The Room Revenue generated by credit card receipts is not cash collateral pursuant to § 363(a) that requires adequate protection or court approval under § 363(c)(2).

22

### d.  PCG's Lien on Restaurant Revenue Does Not Extend Beyond the Petition Date.

The receipts from the sale of food and beverage at the Bennigan's restaurant are not subject to PCG's post-petition lien.  A restaurant located at a hotel will not usually fall within the plain language of § 552(b)(2).  *The Business Bank v. White (In re Timothy Dean Rest. & Bar)*, 342 B.R. 1, 25 (Bankr. D.C. 2006) (nothing in the text or legislative history suggests that Congress intended § 552(b)(2) to apply to food service charges generated by a restaurant located in a hotel).  Restaurants do not seem like "public facilities" that are associated with a hotel, like swimming pools, banquet rooms or conference centers.  Also, restaurants are generally open to the public, and are not limited to parties paying for the privilege to use the space (separately or as an amenity).

This conclusion is particularly applicable on these facts because the original intention was to lease the restaurant for operation by a third party.  The security documents filed with Proof of Claim No. 6 suggest the restaurant was leased when the Debtor acquired the Hotel in 2015.  [ECF No. 79-1.]  The tenant was released for unknown reasons, after which the Debtor began operating the Bennigan's restaurant in early July 2017.  [*See, e.g.*, ECF No. 79, 115.] This lease structure confirms the Bennigan's restaurant was not a public facility contemplated by § 552(b)(2).

The Restaurant Revenue also does not fit because it arises primarily from the sale of services and not inventory.  Revenue from sales of services is not a proceed within the meaning of § 552(b)(1).  *In re Inman*, 95 B.R. 479 (Bankr. W.D. Ky. 1988) (cash and deposits from operating a restaurant do not constitute proceeds from the sale of inventory); *see also Zeeway Corp. v. Rio Salado Bank* (*In re Zeeway Corp.*), 71 B.R. 210, 211 (B.A.P. 9th Cir. 1987)

23

(analogizing gate receipts to income from a restaurant and concluding that such receipts are not cash collateral because revenue is the result of services and not real property); *In re Gen. Assc. Investors Ltd. P'ship*, 150 B.R. at 762 (revenue generated from food and beverages are services that are not rents, proceeds, or profits as defined by § 552); *In re Everett Home Town Ltd. P'ship*, 146 B.R. 453, 456 (Bankr. D. Ariz. 1992) ("Certain revenues at the Club, namely green fees, cart fees, restaurant revenue, tennis fees and pro shop revenue, appear to not fit within any of the Section 552(b) exceptions."); *In re Corner Pockets of the Sw., Inc*., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (income generated by restaurant is not cash collateral); *Bank of N. Ga. v. Strick Chex Columbus Two, LLC (In re Strick Chex Columbus Two, LLC)*, 542 B.R. 914, 919-20 (Bankr. N.D. Ga. 2015) (revenue related to services provided by a restaurant is not proceeds of inventory); *In re Cafeteria Operators*, *L.P*., 299 B.R. 400, 409-10 (Bankr. N.D. Tex. 2003) (same).

PCG's lien does not apply to post-petition Restaurant Revenue related to services provided by the Bennigan's restaurant pursuant to § 552,[11] so it is not cash collateral pursuant to § 363(a) that requires adequate protection or approval under § 363(c)(2).

## III.   CONCLUSION.

PCG has failed to meet its burden to show that its security interest extends to the Debtor's Room Revenue or Restaurant Revenue post-petition.  Therefore, there is no need for the Debtor to seek PCG's consent or to prove PCG is adequately protected as to this property.  PCG still has a lien on the Hotel and related improvements covered by the Mortgage and other collateral subject to the Security Agreement.  It is possible PCG still requires adequate protection for these

---

[11] The Debtor concedes that some of the revenues from the Bennigan's restaurant are proceeds of food inventory in which PCG has a lien, but this portion is a mere fraction of the Debtor's overall Restaurant Revenues.  [ECF No. 156.]

24

interests, but that issue is best decided in relation to the hearing on the Motion for Relief from

the Automatic Stay and For Related Relief and Request to Shorten Notice of Hearing [ECF No.

87] scheduled for hearing on November 20, 2017 [ECF No. 100].

     Based on the foregoing, it is ORDERED the Debtor's Emergency Motion to Extend Cash

Collateral Use [ECF No. 110] is GRANTED, subject to the Fifth Cash Collateral Order.

25

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Wednesday, November 01, 2017**
**(grs)**